United States Courts
Southern District of Texas
FILED

APR 0 6 2011

David J. Bradley, Clerk of Court

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | Criminal No. 11 CR 260 |
| v. | ) | 18 U.S.C. § 371 |
| JGC CORPORATION, | ) | 15 U.S.C. § 78dd-2 |
| Defendant. | ) | |

## INFORMATION

The United States charges:

### General Allegations

At all times material to this Information, unless otherwise stated:

1. The Foreign Corrupt Practices Act of 1977, as amended, Title 15, United States Code, Section 78dd-1, *et seq.* ("FCPA"), was enacted by Congress for the purpose of, among other things, making it unlawful for certain classes of persons and entities to act corruptly in furtherance of an offer, promise, authorization, or payment of money or anything of value to a foreign government official for the purpose of assisting in obtaining or retaining business for, or directing business to, any person.

1

## Relevant Entities and Individuals

### *The Defendant*

2.      Defendant JGC CORPORATION ("JGC") was a Japanese company headquartered in Yokohama, Japan. JGC was engaged in the business of providing engineering, procurement, and construction ("EPC") services around the world.

### *TSKJ, Its Members, and Related Entities*

3.      "TSKJ" was a four-company venture formed in 1990 for the purposes of bidding on and, if successful, performing a series of EPC contracts to design and build a liquefied natural gas ("LNG") plant and several expansions on Bonny Island, Nigeria ("the Bonny Island Project"). TSKJ consisted of Technip S.A., Snamprogetti Netherlands B.V., Kellogg, Brown & Root, Inc., and JGC. The Steering Committee of TSKJ consisted of high-level executives from each of the four joint venture companies. Pursuant to a joint venture agreement, the Steering Committee made major decisions on behalf of TSKJ, including whether to hire agents to assist TSKJ in winning EPC contracts, whom to hire as agents, and how much to pay the agents. Profits, revenues, and expenses generally were shared equally among the four joint venture partners.

4. Kellogg, Brown & Root, Inc. and, before September 1998, its predecessor company, The M.W. Kellogg Company (collectively, "KBR"), were engaged in the business of providing EPC services around the world. KBR was incorporated in Delaware and headquartered in Houston, Texas. As such, KBR was a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

5. Albert Jackson Stanley ("Stanley") was a United States citizen and a resident of Houston, Texas. Stanley served in various capacities as an officer and/or director of KBR, and also served on TSKJ's Steering Committee. Stanley was a "domestic concern" and an officer, employee, and agent of a "domestic concern" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-2.

6. Technip S.A. ("Technip"), a French corporation headquartered in Paris, France, was engaged in the business of providing EPC services around the world. In August 2001, Technip registered a class of securities with the United States Securities and Exchange Commission ("SEC") and in October 2001 became listed on the New York Stock Exchange. As an issuer of publicly traded securities registered pursuant to Section 12(b) of the Securities Exchange Act of 1934, Title 15, United States Code, Section 78l, Technip was required to file periodic reports with the SEC under Section 13

of the Securities Exchange Act, Title 15, United States Code, Section 78m. Accordingly, beginning in August 2001, Technip was an "issuer" within the meaning of the FCPA, Title 15, United States Code, Section 78dd-1.

7. Snamprogetti Netherlands B.V. ("Snamprogetti") was a Dutch corporation headquartered in Amsterdam, The Netherlands, and a wholly owned subsidiary of Snamprogetti S.p.A., an Italian EPC company headquartered in Milan, Italy.

8. M.W. Kellogg Ltd. was a corporation organized under the laws of the United Kingdom. At all relevant times, M.W. Kellogg Ltd. was 55% owned by KBR and 45% owned by JGC.

9. TSKJ operated through three Portuguese special purpose corporations based in Madeira, Portugal: "Madeira Company 1," "Madeira Company 2," and "Madeira Company 3." Both Madeira Company 1 and Madeira Company 2 were owned equally by the four Joint Venture companies. Madeira Company 3, the entity that TSKJ used to enter into consulting agreements with TSKJ's agents, was 50% owned by M.W. Kellogg Ltd., 25% owned by Snamprogetti, and 25% owned by Technip.

*TSKJ's Agents*

10. Jeffrey Tesler was a citizen of the United Kingdom and a resident of London, England. TSKJ hired Tesler to help it obtain business in

Nigeria, including by offering to pay and paying bribes to high-level Nigerian government officials. Tesler was an agent of TSKJ and of each of the joint venture companies.

11. Tri-Star Investments Ltd. ("Tri-Star") was a Gibraltar corporation that Tesler used as a corporate vehicle to enter into agent contracts with and receive payments from TSKJ. By the time TSKJ had stopped paying Tri-Star in January 2004, TSKJ had paid Tri-Star over $130 million for use in bribing Nigerian government officials. Tri-Star was an agent of TSKJ and of each of the joint venture companies.

12. Consulting Company B was a global trading company headquartered in Tokyo, Japan. TSKJ hired Consulting Company B to help it obtain business in Nigeria, including by offering to pay and paying bribes to Nigerian government officials. By the time TSKJ had stopped paying Consulting Company B in June 2004, TSKJ had paid Consulting Company B over $50 million for use in bribing Nigerian government officials. Consulting Company B was an agent of TSKJ and of each of the joint venture companies.

***The Nigerian Government Entities***

13. The Nigerian National Petroleum Corporation ("NNPC") was a Nigerian government-owned company charged with development of

Nigeria's oil and gas wealth and regulation of the country's oil and gas industry. NNPC was a shareholder in certain joint ventures with multinational oil companies. NNPC was an entity and instrumentality of the Government of Nigeria and its officers and employees were "foreign officials," within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

14. Nigeria LNG Limited ("NLNG") was created by the Nigerian government to develop the Bonny Island Project and was the entity that awarded the related EPC contracts. The largest shareholder of NLNG was NNPC, which owned 49% of NLNG. The other owners of NLNG were multinational oil companies. Through the NLNG board members appointed by NNPC, among other means, the Nigerian government exercised control over NLNG, including but not limited to the ability to block the award of EPC contracts. NLNG was an entity and instrumentality of the Government of Nigeria and its officers and employees were "foreign officials," within the meaning of the FCPA, Title 15, United States Code, Sections 78dd-1(f)(1)(A), 78dd-2(h)(2)(A), and 78dd-3(f)(2)(A).

***The Bonny Island Project***

15. Between 1995 and 2004, TSKJ was awarded four EPC contracts to build the Bonny Island Project. Each EPC contract

6

corresponded to one of the four phases in which the Bonny Island Project was constructed. An LNG "train" is the infrastructure necessary to pipe raw natural gas from wellheads, convert the raw gas to purified LNG, and deliver that LNG to a tanker. The first phase of the Bonny Island Project consisted of two trains (Trains 1 and 2), the second phase consisted of one train (Train 3), the third phase consisted of two trains (Trains 4 and 5), and the fourth phase consisted of one train (Train 6). The first EPC contract, covering Trains 1 and 2, was awarded to TSKJ through an ostensibly competitive international tender. The other three EPC contracts were awarded to TSKJ on a sole-source, negotiated basis. The four EPC contracts awarded to TSKJ collectively were valued at over $6 billion.

## COUNT 1

### Conspiracy to Violate the Foreign Corrupt Practices Act
### (18 U.S.C. § 371)

16.     Paragraphs 1 through 15 are realleged and incorporated by reference as though fully set forth herein.

17.     From at least in or around August 1994, to on or about June 15, 2004, in the Southern District of Texas, and elsewhere, defendant JGC did unlawfully, willfully, and knowingly combine, conspire, confederate, and agree with TSKJ, KBR, Technip, Snamprogetti, Stanley, Tesler, Tri-Star, Consulting Company B, and others, known and unknown, to commit

7

offenses against the United States, that is, to willfully make use of the mails and means and instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of any money, offer, gift, promise to give, and authorization of the giving of anything of value to any foreign officials, and to any person while knowing that all or a portion of such money or thing of value would be or had been offered, given, or promised, directly or indirectly, to foreign officials, for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government and instrumentalities, in order to assist JGC, KBR, Technip, TSKJ, and others in obtaining and retaining business for and with, and directing business to, JGC, KBR, Technip, TSKJ and others, in violation of Title 15, United States Code, Sections 78dd-1 and 78dd-2.

### Purpose of the Conspiracy

18. The purpose and object of the conspiracy was to obtain and retain billions of dollars in contracts related to the Bonny Island Project

8

through the promise and payment of tens of millions of dollars in bribes to officials of the executive branch of the Government of Nigeria, officials of NNPC, officials of NLNG, and others.

## Manner and Means of the Conspiracy

19. JGC and its co-conspirators employed various manner and means to carry out the conspiracy, including but not limited to the following:

    a. Employees, and agents of JGC and their co-conspirators, including Consulting Company B, held so-called "cultural meetings" at which they discussed, among other things, the use of particular agents, including Tesler and Consulting Company B, to pay bribes to officials of the Government of Nigeria in order to secure the officials' support for TSKJ in obtaining and retaining contracts to build the Bonny Island Project.

    b. Senior Executives, employees, and agents of JGC and their co-conspirators agreed that TSKJ would hire Tri-Star to pay bribes to high-level Nigerian government officials, including top-level executive branch officials, and Consulting Company B to pay bribes to lower level Nigerian government officials, including employees of NLNG, in exchange for the officials' assistance in obtaining and retaining contracts to build the Bonny Island Project.

   c. Senior executives, employees, and agents of JGC and their co-conspirators caused Madeira Company 3 to execute consulting contracts with Tri-Star and Consulting Company B providing for the payment of tens of millions of dollars in consulting fees in exchange for vaguely described marketing and advisory services, when in fact the primary purpose of the contracts was to facilitate the payment of bribes on behalf of TSKJ and its members to Nigerian government officials.

   d. Prior to NLNG's award to TSKJ of the various EPC contracts, Stanley and other co-conspirators met with successive holders of a top-level office in the executive branch of the Government of Nigeria and subsequently negotiated with the office holders' representatives regarding the amount of the bribes that TSKJ would pay to the Nigerian government officials.

   e. Senior executives, employees, and agents of JGC and their co-conspirators caused wire transfers totaling approximately $132 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to bank accounts in New York, New York, to be further credited to bank accounts in Switzerland and Monaco controlled by Tesler for Tesler to use to bribe Nigerian government officials.

  f. On behalf of TSKJ and the four joint venture companies, Tesler wire transferred bribe payments to or for the benefit of various Nigerian government officials, including officials of the executive branch of the Government of Nigeria, NNPC, and NLNG, and for the benefit of a political party in Nigeria.

  g. Senior executives, employees, and agents of JGC and their co-conspirators caused wire transfers totaling over $50 million to be sent from Madeira Company 3's bank account in Amsterdam, The Netherlands, to Consulting Company B's bank account in Japan for Consulting Company B to use to bribe Nigerian government officials.

## Overt Acts

20. In furtherance of the conspiracy and to achieve its purpose and object, at least one of the co-conspirators committed or caused to be committed, in the Southern District of Texas, and elsewhere, the following overt acts, among others:

  a. On or about August 3, 1994, Wojciech Chodan ("Chodan"), an M.W. Kellogg Ltd. salesperson responsible for the Bonny Island Project, sent a facsimile from London, England, to Stanley in Houston, Texas, two executives of JGC, and another co-conspirator stating, among other things, that Stanley, an executive of JGC, and other top

executives of the joint venture companies had agreed to send a message "to the top man that we are ready to do business in the customary manner" and to ask Consulting Company B to secure support from the key individuals at the working level of NLNG.

      b.    On or about November 2, 1994, Tesler told Chodan that he had spoken with a senior official of the Nigerian Ministry of Petroleum, that Tesler's fee would be $60 million, that the first top-level executive branch official of the Government of Nigeria would get $40-45 million of that fee, that other Nigerian government officials would get the remaining $15-20 million of that fee, and that there would be a meeting between Stanley and the first top-level Nigerian executive branch official before the execution of any written agreement between TSKJ and Tesler.

      c.    On or about November 30, 1994, Stanley and other co-conspirators met in Abuja, Nigeria, with the first top-level executive branch official of the Government of Nigeria to verify that the official was satisfied with TSKJ using Tesler as its agent and to confirm that the first top-level executive branch official wanted TSKJ to negotiate with the senior official of the Ministry of Petroleum the amounts of bribes to various Nigerian government officials.

12

   d. On or about March 20, 1995, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $60 million to Tri-Star if TSKJ was awarded a contract to construct Trains 1 and 2 of the Bonny Island Project.

   e. On or about December 27, 1995, Madeira Company 3 wire transferred $1,542,000 to Tri-Star, via a correspondent bank account in New York, New York, in payment of Tri-Star's first invoice under the consulting agreement for Trains 1 and 2.

   f. On or about April 9, 1996, Madeira Company 3 entered into an agreement with Consulting Company B whereby it agreed to pay Consulting Company B $29 million for assisting TSKJ in winning the contract to build Trains 1 and 2 of the Bonny Island Project.

   g. On or about July 26, 1996, Tesler caused $63,000 to be wire transferred to a Swiss bank account controlled by the senior official of the Ministry of Petroleum.

   h. On or about May 1, 1997, Stanley and other co-conspirators met in Abuja, Nigeria, with the first top-level executive branch official of the Government of Nigeria and requested that the official designate a representative with whom TSKJ should negotiate the bribes to

Nigerian government officials in exchange for the first top-level executive branch official's support of the award of the Train 3 EPC contract to TSKJ.

  i. On or about February 28, 1999, Stanley and other co-conspirators met in Abuja, Nigeria, with a second top-level executive branch official of the Government of Nigeria to request that the official designate a representative with whom TSKJ should negotiate the bribes to Nigerian government officials in exchange for the second top-level executive branch official's support of the award of the Train 3 EPC contract to TSKJ.

  j. On or about March 5, 1999, Stanley, two JGC executives, and other co-conspirators met in London, England, with the representative designated by the second top-level executive branch official of the Government of Nigeria to negotiate the bribes to Nigerian government officials in exchange for the award of the Train 3 EPC contract to TSKJ.

  k. On or about March 18, 1999, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $32.5 million to Tri-Star if TSKJ was awarded a contract to construct Train 3 of the Bonny Island Project.

  l. On or about March 13, 2000, Madeira Company 3 entered into a consulting agreement with Consulting Company B promising to pay it $4 million in connection with Train 3 of the Bonny Island Project.

14

      m.    On or about January 16, 2001, Tesler caused $2.5 million to be wire transferred to a Swiss bank account controlled by the representative designated by the second top-level executive branch official of the Government of Nigeria.

      n.    On or about November 11, 2001, Stanley and a KBR salesperson met in Abuja, Nigeria, with a third top-level executive branch official of the Government of Nigeria and an NNPC official (the "NNPC Official") to request that the third top-level executive branch official designate a representative with whom TSKJ should negotiate the bribes to Nigerian government officials in exchange for the third top-level executive branch official's support of the award of the Trains 4 and 5 EPC contract to TSKJ.

      o.    On or about December 24, 2001, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $51 million to Tri-Star if TSKJ was awarded a contract to construct Trains 4 and 5 of the Bonny Island Project.

      p.    On or about May 28, 2002, an executive of JGC and others authorized Madeira Company 3 to sign a consulting agreement with Tri-Star for the Train 6 contract.

q. In or about June 2002, Tesler, the NNPC Official, and an employee of one of TSKJ's subcontractors (the "Subcontractor") met at a hotel in London, England, to discuss the NNPC Official's request that the Subcontractor help funnel payments from Tesler to a political party in Nigeria.

r. On or about June 14, 2002, Madeira Company 3 entered into a consulting agreement with Consulting Company B providing, among other things, that Madeira Company 3 would pay $25 million to Consulting Company B in connection with Trains 4 and 5 of the Bonny Island Project.

s. On or about June 28, 2002, Madeira Company 3 entered into an agreement with Tri-Star providing, among other things, that Madeira Company 3 would pay $23 million to Tri-Star if TSKJ was awarded a contract to construct Train 6 of the Bonny Island Project.

t. In or about August 2002, an employee of the Subcontractor, using funds that Tesler had caused to be wire transferred to the Subcontractor, delivered a pilot's briefcase containing one million U.S. dollars in one-hundred dollar bills to the NNPC Official at a hotel in Abuja, Nigeria, for the benefit of a political party in Nigeria.

u. On or about March 4, 2003, Chodan caused to be e-mailed to two KBR executives in Houston, Texas, a draft memo for release

to French authorities investigating potential crimes in connection with the Bonny Island Project that included false statements about how Tesler had helped TSKJ to win the various EPC contracts.

      v.    In or about April 2003, an employee of the Subcontractor, using funds that Tri-Star had wire transferred to the Subcontractor, delivered a vehicle containing Nigerian currency valued at approximately $333,333 to the hotel of the NNPC Official in Abuja, Nigeria, for the benefit of a political party in Nigeria.

      w.    On or about May 30, 2003, Madeira Company 3 wire transferred $123,500 to Tri-Star, via a correspondent bank account in New York, New York, in payment of one of Tri-Star's invoices under the consulting agreement for Train 3 of the Bonny Island Project.

      x.    On or about June 15, 2004, Madeira Company 3 wire transferred $3 million to Consulting Company B in payment of one of Consulting Company B's invoices under the consulting agreement for Trains 4 and 5 of the Bonny Island Project.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2

### Aiding and Abetting Violations of Foreign Corrupt Practices Act (15 U.S.C. § 78dd-2 & 18 U.S.C. § 2)

21. Paragraphs 1 through 15 and 18 through 20 are realleged and incorporated by reference as though fully set forth herein.

22. On or about the dates set forth below, in the Southern District of Texas, and elsewhere, defendant JGC willfully did aid, abet, counsel, command, induce, procure, and cause the commission of an offense against the United States, that is, the willful use by KBR, a domestic concern, of instrumentalities of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, and authorization of the payment of money to a person, while knowing that all or a portion of such money would be or had been offered, given, or promised, directly or indirectly, to foreign officials, for purposes of: (i) influencing acts and decisions of such foreign officials in their official capacities; (ii) inducing such foreign officials to do and omit to do acts in violation of the lawful duties of such officials; (iii) securing an improper advantage; and (iv) inducing such foreign officials to use their influence with a foreign government and instrumentalities thereof to affect and influence acts and decisions of such government or instrumentalities, in order to assist defendant JGC, KBR, TSKJ, and others in obtaining and

retaining business for and with, and directing business to, defendant JGC, KBR, TSKJ, and others, to wit, defendant JGC aided and abetted KBR in causing the following corrupt U.S. dollar payments to be wire transferred from Madeira Company 3's bank account in Amsterdam, The Netherlands, via correspondent bank accounts in New York, New York, to bank accounts of Tri-Star in Switzerland for use in part to bribe Nigerian government officials:

| Count | Dates | Amounts | Description |
|---|---|---|---|
| 2 | April 1, 2002 to January 12, 2004 | $39,800,000 | Payments to Tri-Star pursuant to Consulting Agreement for Trains 4&5 |

All in violation of Title 15, United States Code, Section 78dd-2, and Title 18, United States Code, Section 2.

DENIS J. McINERNEY
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

By: _William Stuckwisch_
William J. Stuckwisch
Assistant Chief
D.C. Bar No. 457278

_Patrick F. Stokes_
Patrick F. Stokes
Deputy Chief
Maryland State Bar

U.S. Department of Justice
Fraud Section, Criminal Division
1400 New York Avenue, N.W.
Washington, D.C. 20005
Tel: (202) 353-2393
Fax: (202) 514-0152